IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 12-53-RGA |
| | : | |
| SALEEM AKBAR SHARIF, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Saleem Akbar Sharif, by and through his undersigned counsel, Edson Bostic, Federal Public Defender, hereby submits the following Sentencing Memorandum in support of his Motion For Downward Departure Pursuant To U.S.S.G. §§ 5H1.3, 5H1.11, and 5K2.13, and request for a sentencing variance from the advisory Guidelines range of 151 to 188 months. For the reasons set forth below, Mr. Sharif respectfully requests that the Court impose a sentence of 60 months. The requested sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

### I. INTRODUCTION

On August 1, 2012, the Government filed a two-count Information, charging Mr. Sharif with conspiracy to import 100 grams or more of heroin, in violation of 21 U.S.C. §§ 952(a)(1), 960(b)(2)(A) and 963, and possession with the intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). On September 13, 2012, this Court accepted Mr. Sharif's Memorandum of Plea Agreement, in which he pled guilty to the Information, and stipulated to the drug amount, sentencing offense level, and enhancements. Mr. Sharif also agreed to pay

$100,000 in restitution to the United States.

## II.  MR. SHARIF'S PERSONAL HISTORY

Mr. Sharif's revised Presentence Investigation Report ("PSR") fairly sets forth his background and personal history, and he has no objections to the PSR.[1]  There are, however, specific facts about his life and circumstances that may inform the Court's decision at sentencing, particularly on the issue of why the advisory Sentencing Guidelines range does not effectively achieve the goals of sentencing in his case.

### A.  Mr. Sharif's Childhood and Young Adult Life

Exhibit A of this sentencing memorandum contains a picture of Mr. Sharif and his family, and a small sampling of the numerous honors and rewards he has received since elementary school. Those early achievements reflect the values instilled by his mother and family in rural John's Island, South Carolina, and a young man with limitless potential.

By all accounts, Mr. Sharif lived a sheltered, and carefully nurtured life, and his mother sacrificed to raise him and his siblings to be well-rounded citizens with solid morals and values.  See PSR at ¶ 69-70; See also, Dr. Catherine Barber's Report at 7 ("Exhibit C").[2]  Years of elite schools, sports, workshops, camps, and field trips were supposed to produce that citizen, and, at first, they did.

---

[1]  Mr. Sharif, however, has one factual correction.  Paragraph 49 states: "According to Mr. Sharif, he was friends with Darrold Thomas for a number of years and also sold Mr. Thomas marijuana after the defendant returned from Iraq."  Mr. Sharif would like to correct this paragraph because he did not sell marijuana to Mr. Thomas.  Mr. Sharif and Mr. Thomas smoked marijuana together, but there were no sales of marijuana between the two of them.

[2]  This report will be submitted to the Court and the Government under separate cover.

2

Mr. Sharif attended the Academic Magnet High School, one of the top public schools in the country according to *U.S. News and World Report*, and he was an honors student with plans to attend the University of South Carolina, or its in-state rival, Clemson University.  By his junior year of high school, Mr. Sharif's grades and achievements attracted the attention of West Point Academy, and the late Senator Strom Thurmond recommended him to the school.  See "Sharif appointment to academy," *Post and Courier* ("Exhibit A").

As noted by Mr. Sharif's hometown newspaper, "It must have been fate that paired 17-year-old Saleem Sharif with the U.S. Military Academy at West Point, N.Y."  Id.  That fateful pairing led to a year of military prep school and a full scholarship to West Point, and Mr. Sharif graduated in 1999 with a degree in Engineering Management.  See PSR at ¶ 77.

Two days after graduation, Mr. Sharif entered military service as a commissioned officer.  Id. The young man with so much promise and potential had arrived, and he was ready to take his place in the world  by serving his country.

**B.  Mr. Sharif's Military Service & Adult Life**

Mr. Sharif's military service included deployments to Iraq and Afghanistan, and he served as a public affairs officer.  Id. at ¶ 74.  He was a unit leader in the Information Operations section of the Army, and he was charged with "disseminating information to the Iraqi public about the coalition's mission in that country, in what was broadly referred to as the Hearts and Minds campaign."  See Dr. Barber's Report at 3.  Mr. Sharif's mission entailed working closely with native Iraqis in the journalism field and civilian contractors, and he explains: "We tried to focus our efforts along certain lines of operation, trying to get effect out of the mission.  Because I was a Muslim, they thought I would be a good fit for that."  Id. at 3. See also, PSR at ¶¶ 74, 78.  Mr. Sharif's Muslim faith caused

3

deep and mixed feelings of pride and resentment because he was participating in a war in a Muslim country, but he felt that his mission came first.  Id.

Mr. Sharif experienced combat and supervised his soldiers during dozens of convoy operations that amounted to "driving through a minefield."  Id.  During the early years of the Iraq war, soldiers were often in battle with little protection. Id.  Mr. Sharif describes that time as "crazy," "tense," and "frightening," and one of his superiors had a nervous breakdown.  Id.

Mr. Sharif took pride in leading, and he wanted to do his best to lead his soldiers.  Id.  He saw, however, three of his fellow servicemen die during the tour in Iraq.  See PSR at ¶ 74.

Mr. Sharif work duties also included recruiting Iraqi citizens to assist the military, despite the "high likelihood that they may be killed ...."  See PSR at ¶¶ 74, 78.  Mr. Sharif grew close to some of the locals, and he recounts his experiences with Mohammed and Haider, Iraqi reporters.  Together, the trio worked to explain "the coalition's mission to the native population, [and] ... to dispel fear and misinformation."  See Dr. Barber's Report at 3. Mr. Sharif describes this as a complex task because of local suspicions and resentment of Iraqis who allied themselves with American forces.  Id. at 3-4.

According to Mr. Sharif, Mohammed and Haider asked to live on the base because they were in danger, but Mr. Sharif was unable to secure authorization for the request. Id.  In response, Mohammed asked Mr. Sharif: "What are you going to do if they kill me?"  Id.  Mr. Sharif told Mohammed he would "be all right."  Id.

Mohammed was killed during an attack that also injured Haider, and Mohammed's death continues to haunt Mr. Sharif.  Mr. Sharif explains: "When he died, that kind of hit me the hardest; that, and a few of my soldiers who died over there.  There was enough death.  If I had made my case more poignantly…" Id.

4

After Mohammed's death, his oldest son, Ibrahim, took his place.  Mr. Sharif and Ibrahim were the same age, and a couple of months later, Ibrahim died in an attack.  Id.  "When I got the news that he had got killed," Mr. Sharif recalls, "I kind of shut down.  After he got killed, nobody else wanted to come, and so after that, they did let a couple of guys live there (on the base)."  Id.

But there were other Iraqi locals who died because of their alliance with the United States.  "There was another guy named Ali, and his son, Kareem," Mr. Sharif recounts.  "[T[hey got shot up in one of our trucks.  I had to make my soldiers clean it out of the truck."  Id. at 5.  He has vivid recollections of the "dried pools of human blood, and the flies" after the incident.  Id.

Mr. Sharif served for 12 months in Iraq, and he recounts letting his soldiers go home first for breaks before he did.  "I didn't feel like I needed a break; after all that happened, I just went numb to all the violence."  Id. at 4.

But Mr. Sharif was unable to withstand the emotional weight of filming memorials for soldiers who died in combat.  "Our section filmed the memorial services we had for our fallen comrades, to send back to their families, at least six times.  I broke down crying when we filmed them.  Those were the only times I could (exhibit my emotions)."  Id. See also, PSR at ¶ 74.

Mr. Sharif did not receive any counseling or debriefing after his deployment and service.  "There were options to talk to a doctor, but I was ready to put it behind me.  I felt like my tour wasn't really so bad compared to what some other people went through."  Id. at 5.

Thus, instead of seeking help, "because every soldier went through the same experience," Mr. Sharif turned to marijuana and alcohol to self-medicate.  Id. at ¶76.  See also, Dr. Barber's Report at 5.  Those activities were against his religion, but it was the only way to forget the war, the faces of fallen soldiers and their grieving families, and the Iraqi citizens who died assisting the United

States.  Mr. Sharif had once dreamed of becoming a career officer in the Army, but it meant more deployments.  Id. at 74. On September 15, 2005, Captain Saleem Sharif was honorably discharged from the Army.

After his discharge, Mr. Sharif opened a water ice business in Texas, but it went out of business less than two years later.  Id. at ¶ 81.  During this time, Mr. Sharif's friends and family noticed a change in him, and although he felt like a different person, "he was not alarmed by this at all," because he "expected that the war would change me."  See Saleem Sharif's Letter to the Court (Exhibit B).  Mr. Sharif now admits, however, that he feared discussing and dealing with his issues, and he began to drift away from his friends and family because he was too proud to admit that he needed help.  Id.  Mr. Sharif's life was in shambles:

> Although I was able to channel some of my energy toward my first entrepreneurial endeavor, I could not shake the feeling of being directionless. I went from being a very driven individual to a man without a purpose almost overnight.  I began using drugs to escape the fact that my life and my thoughts were in complete disarray. Instead of helping me, this only opened the door to more reckless behavior.

Id.

Mr. Sharif had a friend who went to work in Afghanistan in the IT field. Mr. Sharif did not want to go back, "but when the business faltered, I guess I felt like, 'At least I won't have a weapon.' I kind of let go of those feelings of not wanting to go back over."  See Dr. Barber's Report at 5.

**C.  The Offense Conduct and Mr. Sharif's Life Post-Arrest**

Mr. Sharif returned to Afghanistan and remained there for four years.  Prior to his return, he had stopped smoking marijuana for eight months because he wanted to get on track.  Id. at 6.  "But over there everybody smokes hash, " he explains. " I fell into doing it because it was so cheap, and everyone did it.  I met some guys and that's what they were into; it was just something to do.

Afghanistan was boring, but tense.  We smoked with a lot of the police, even when they were in uniform.  They accept it because alcohol is pretty much outlawed."  Id.

Mr. Sharif's activities led to "nonsense," as he describes it. One day, as he worked his second job, he got into a minor car accident near a police checkpoint with an individual who was drunk.  Id. The fender-bender led to an argument and a fight.  "The police jumped on me—they wanted to fight me," Mr. Sharif recounts.  "They ended up ripping my shirt off.  I tried to flee and they shot up the vehicle.  I drove off and they blew out my tires.  I made it back to close proximity to the base, and some soldiers towed me back."  Id.  Mr. Sharif further described the harrowing incident: "I felt like I wasn't there; like I couldn't feel them hitting me with their rifles.  I didn't feel the gravity or the danger.  It didn't bother me.  It just didn't bother me."  Id.

Yet Mr. Sharif also recalls: "I did feel like I was kind of looking at it like an observer, maybe because I was afraid.  I wouldn't call it an out-of-body experience, but it was intense.  It was like it wasn't really happening."  Id.

After the incident, Mr. Sharif lost his job.  Id.  Another individual talked to him about drug dealing, and other individuals boasted about their activities. Mr. Sharif states:

> Before my Iraq deployment, a female friend and fellow officer in Texas suggested
> drug dealing as a way to make some money, and I got really mad at her.  Later, I
> guess I felt like if I could do that—participate in a war—then I could do anything.
> Nothing was off-limits.

Id.

As described in Dr. Barber's report, Mr. Sharif has a "clearly evident, profound sense of shame," for his illegal activities.  Id. at 7.  He drifted during this time and lost his direction.  Id.  Mr. Sharif explains:

> I felt I wasn't a Muslim any more.  I took part in all this death of Muslims.  After I got out, everything I did to stay on the straight and narrow led me to this point, to such guilt about what happened over there, I just lost direction.  I never got a handle on it, as far as me being a Muslim over there.  I let go of a lot of myself, my values. I'm definitely embarrassed and ashamed.  I never wanted my family to know what I had become.  This is my worst nightmare.

Id.

Mr. Shariff's letter to the Court captures the core of his tragic, downward spiral, and how his processing of his time in the military shaped his behavior and thoughts:

> Behavior that had been foreign to me became acceptable: drug use, violence, and neglecting my familial obligations.  And somewhere along this self-destructive path I began to ignore my conscience.  In simultaneously turning away from my family, the military, the Muslim community, and my conscience as well I now realize that I all but ensured the abandonment of my core values and the loss of my morality.  My life became inundated by trial after trial.  Not only did I lose my moral compass, but I felt hopelessly unable to stop the madness that was now my everyday reality.  To be sure, it was just before I reached the point of no return that I was picked up by the federal agents.  And to this day I still feel like my incarceration is a true blessing in disguise.

Id.

Today, as Mr. Sharif reflects on his life and actions, he accepts that it will be some time before he can start his life "all over."  Id. But in addition to his deep remorse, he has a steady resolve to focus on his life and goals with the help of his strong support system.  He is surrounded by friends and family who have never been involved in illegal activity, and he plans to rely on them as he rebuilds his life.  See Character Letters (Exhibit D).  The letters of support demonstrate that despite Mr. Sharif's mistakes, his support network consists of individuals who support and believe in the man they know him to be.

Mr. Sharif acknowledges that taking "the easy way out has left my life in shambles, and has hurt everyone that is close to me."  See Mr. Sharif's Letter to the Court.  But he explains:

This will not be a recurring theme in my life. As I turn the page in this chapter of my life, I now know that there are certain elements that I must labor hard to guard myself against. I only hope that someone else will look at my story and at least learn something from my experiences. We must never rest on our laurels and expect for things to go our way. And we must never ignore that whisper from our conscience–no matter how faint, that tells us to do the right thing even when no one else is looking.

Id.

### D.  **Dr. Barber's Evaluation and Diagnosis**

Dr. Catherine Barber conducted a psychological examination of Mr. Sharif in March 2013 and April 2013.   Based on her evaluation, Dr. Barber determined that Mr. Sharif suffers from Posttraumatic Stress Disorder ("PTSD").

Dr. Barber explained and opined:

These impacts have become chronic, persisting for months and years after the occurrence of the traumatic events, and they have caused significant objective and subjective functional impairment for Mr. Sharif in the ensuing years. As a result of his emotionally shocking, chronically stressful, and at times gruesome experiences in Iraq, he continues to this day to suffer not only serious intrapsychic trauma symptoms, as detailed above, but a genuine "moral trauma" associated with his intense sense of survivor's guilt. He tends to minimize the extremity of the events he witnessed and experienced, and therefore the extent of his trauma, in comparison to that endured by others. He has an additional source of moral guilt and identity confusion arising from his harsh self-judgment at being raised in a devout Muslim household, and yet having participated, through his military service, in the deaths of other Muslims. This is further compounded by the fact that his attendance at West Point was a source of great pride to his family, and serving his country was a source of significant pride and self-esteem for Mr. Sharif.

Additionally, upon his separation from the Army, Mr. Sharif experienced a profound degree of free-floating anxiety, a sense of being insecure, adrift and of losing his bearings. It is my opinion, to a reasonable degree of psychological certainty, that Mr. Sharif's untreated Posttraumatic Stress Disorder, with its attendant distortions of cognition, was a decisive factor in his behavior throughout the entire time frame in which he engaged in the offense conduct, and that it was of sufficient severity to constitute a condition of diminished mental capacity impairing his ability to exercise

9

sound reason and judgment and to adequately differentiate between right and wrong
in his choices.

Id. at 14.

Dr. Barber, however, emphasized that combat-related PTSD is not the "original" form of this
disorder (first identified as "shellshock" or "battle fatigue"). Id. She explained that it is, "in the view
of many experts, an especially severe variant, due to the fact that combat experiences often entail
exposure to extremely harrowing sensory and emotional experiences combined with a protracted
factor of inescapability." Id.

Dr. Barber found that Mr. Sharif also has a substance dependence problem, and she noted that
he has not had the benefit of a prolonged treatment experience. Id. at 14-15. Dr. Barber cited the
lack of comprehensive, empirically-based treatment programs for veterans suffering from PTSD, and
she concluded, from a clinician's standpoint, that "a prolonged period of incarceration is unlikely to
have an appreciable corrective or rehabilitative impact on Mr. Sharif's future conduct."

Id. at 15.  Dr. Barber further concluded:

> He has already demonstrated profound remorse for his behavior, and has already
> sustained what to him is the most significant form of punishment, i.e., his perceived
> loss of honor and esteem in the eyes of his family.  The single most influential factor
> in Mr. Sharif's capacity to fully rehabilitate and refrain from any similar future
> conduct will be his access to effective treatment to resolve his Posttraumatic Stress
> Disorder; and it is anticipated that this will become an attainable goal once he is
> released to the community and can obtain relevant services (inpatient and/or intensive
> outpatient, with ongoing outpatient follow-up) through the [Veterans
> Administration].

Id.


## III.  STATUTORY PROVISIONS & GUIDELINES CALCULATION

As calculated by Probation and Pretrial Services, Mr. Sharif's base offense level is 32 based on the Drug Quantity Table in U.S.S.G. § 2D1.1(c)(4).  See PSR at ¶ 53.  Probation and Pretrial Services calculated a two-level aggravating role enhancement, pursuant to U.S.S.G. § 2D1.1(b)(14)(C) and U.S.S.G § 3B1.1, and a two-level aggravating role enhancement pursuant to U.S.S.G. § 3B1.1(c). Mr. Sharif also received a three-level reduction for acceptance of responsibility, resulting in a total offense level of 33.  Id. at ¶¶ 27-30.

Mr. Sharif has three criminal history points based on his criminal history and probation status at the time of the instant offense, resulting in a Criminal History Category of II.  Id. at ¶¶ 62-66. Thus, Mr. Sharif's advisory Sentencing Guidelines range is 151 to 188 months, with a mandatory statutory minimum of 60 months.  Id. at ¶¶ 86-87.

## IV.  **DISCUSSION**

### A.  **The Third Circuit's Three-Step Sentencing Process**

In United States v. Gunter, 462 F.3d 237 (3d Cir. 2006), the Third Circuit set out a three-step process for district courts to follow in imposing sentences after the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).  First, courts must continue to calculate a defendant's Guidelines precisely as they would have before Booker.  Second, in doing so, courts must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account the Circuit's pre-Booker case law, which continues to have advisory force.  Third, courts are required to exercise their discretion by considering the relevant Section 3553(a) factors in setting the sentence they impose, regardless [of] whether it varies from the sentence calculated under the Guidelines.  Gunter, 462 F.3d at 247.

11

Mr. Sharif has no objection to the calculation of the advisory Sentencing Guidelines range. He has filed a Motion For Downward Departure Pursuant To U.S.S.G. §§ 5H1.3, 5H1.11, and 5K2.13, and he is also requesting a downward sentencing variance based on the court's discretion. Thus, the arguments contained in this sentencing memorandum address steps two and three of the Gunter sentencing process.

### B.  This Court Should Grant a Downward Departure, Pursuant To U.S.S.G. §§ 5H1.3, 5H1.11 and 5K2.13, Because of Mr. Sharif's Diminished Capacity.

On the surface, Mr. Sharif's case is one of a man who had substantial opportunities but turned to illegal activity.  He is not the typical individual who appears before this Court, and, the atypical nature of his case presents the circumstances that the Sentencing Guidelines range do not address. In Part H and Part K of the Sentencing Guidelines, the Sentencing Commission identified special characteristics that courts should consider as departure grounds for this reason.

Mr. Sharif submits that a departure is warranted based on his military service and PTSD. Because they are intricately related, the arguments below equally speak to Mr. Sharif's substantial service to his country and the resulting effect on his mental and emotional health.

Part H of the Sentencing Guidelines "addresses the relevancy of certain specific offender characteristics in sentencing."  Introductory Commentary to Part H.  The purpose of the section is to provide a framework for addressing specific offender characteristics, and it includes characteristics that "may warrant a sentence outside the applicable guidelines range if the characteristic, individually or in combination with other such characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  Id.  Two of those characteristics are

12

military service, pursuant to Section 5H1.11, and mental and emotional conditions, pursuant to

Section 5H1.3.

Section 5H1.11 states: "Military service may be relevant in determining whether a departure

is warranted, if the military service, individually or in combination with offender characteristics, is

present to an unusual degree and distinguishes the case from the typical cases covered by the

guidelines."

Section 5H1.3 states: "Mental and emotional conditions may be relevant in determining

whether a departure is warranted, if such conditions, individually or in combination with other

offender characteristics, are present to an unusual degree and distinguish the case from the typical

cases covered by the guidelines." This section provides a cross-reference to Chapter Five, Part K of

the Guidelines, and Section 5K2.0 of the Sentencing Guidelines encourages courts to depart

downward from the applicable Guidelines range if there are "offense characteristics or offender

characteristics of a kind, or to a degree, not adequately taken into consideration by the Sentencing

Commission in determining [the guidelines] range. U.S.S.G. §5K2.0, n.1.

Specifically, Section 5K2.13 states that a departure may be warranted if:

(1) the defendant committed the offense while suffering from a significantly reduced
mental capacity; and (2) the significantly reduced mental capacity contributed
substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should
reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

Id. See also, United States v. McBroom, 124 F.3d 533, 539 (3d Cir. 1997).

"Significantly reduced mental capacity" is defined as the "significantly impaired ability to (A)

understand the wrongfulness of the behavior comprising the offense or to exercise the power of

reason; or (B) control behavior that the defendant knows is wrongful." U.S.S.G. §5K2.13, n.1.

Courts may not grant this departure if voluntary drug use caused the diminished capacity, the defendant's offense level involved violence or serious threats of violence, the defendant's extensive criminal history demonstrates an extensive need for incarceration to protect the public, or the defendant committed an offense under 18 U.S.C. § 71, 109A or 117.

These characteristics go to the heart of why Mr. Sharif committed the offense conduct, and the Court should depart downward for these reasons. Mr. Sharif's military service, while significant and exemplary, led to PTSD, and it was a "decisive factor in his behavior throughout the entire time frame in which he engaged in the offense conduct." See Dr. Barber's Report at 14.

In 2008, the RAND Center for Military Health Policy Research estimated that of the 1.64 million troops who served in Operations Enduring Freedom and Iraqi Freedom, approximately 300,000 veterans currently suffer from Post Traumatic Stress Disorder. See *Invisible Wounds of War: Psychological and Cognitive Injuries, Their Consequences, and Services to Assist Recovery* (Terri Tanelian & Lisa H. Jacox eds., 2008).[3] In 2010, *The New York Times* reported that courts are recognizing that military veterans returning home carry a "heavy burden of damage" that is not physically visible. See "Defendants Fresh From War Find Service Counts in Court," (Joseph Schwartz, March 15, 2010) (Exhibit E) The article noted: "At the federal level, judges are bucking guidelines that focus more on the nature of the crime than on the qualities of the person who committed it," and the "judges' decisions are part of a broader fight over sentencing, and over once-rigid federal guidelines that tend to punish the crime while giving little weight to the specific circumstances of the defendant." Id.

---

[3] This ebook is available at http://rand.org/pubs/monographs/MG720.html.

Indeed, in <u>Porter v. McCollum</u>, 558 U.S. 30 (2009), the Supreme Court found a defense

attorney ineffective for failing to present mitigation evidence of the defendant's military service and

mental health during the penalty phase of the defendant's case.  The Court stated:

> Our Nation has a long tradition of according leniency to veterans in recognition of
> their service, especially for those who fought on the front lines as [the defendant] did.
> Moreover, the relevance of [the defendant's] extensive combat experience is not only
> that he served honorably under extreme hardship and gruesome conditions, but also
> that the jury might find mitigating the intense stress and mental and emotional toll that
> combat took on [the defendant].

<u>Id.</u> at 43-44.  <u>See also</u>, <u>United States v. Kimbrough</u>, 552 U.S. 85 (2007) (citing the sentencing court's

consideration of the defendant's military service as a mitigating factor under Section 3553a).

West Point Academy recruited Mr. Sharif while he was in high school.  He graduated, entered

the military as an officer, and served our country in Iraq and Afghanistan.  His experiences included

active combat, in which he supervised his soldiers during dozens of convoy operations that amounted

to "driving through a minefield."

He served as a unit leader, and he was charged with working closely with Iraqi journalists to

disseminate information to Iraqi citizens about our country's mission. And, he recorded memorials

to his fallen comrades so that their families could remember and honor their loved ones. It should be

noted that none of the offense conduct occurred while Mr. Sharif served our country, and he was

honorably discharged.  Counsel respectfully submits that the Court should grant a departure on these

grounds.

But while Mr. Sharif's service was honorable, the aftermath of war haunted and scarred him

emotionally, and led to the development of PTSD.  War and death were a far cry from the good life

promised to solid citizens who worked hard, and none of Mr. Sharif's education, accomplishments, or training prepared him to deal with the trauma he experienced.

Courts within the Third Circuit have granted downward departures based on diminished capacity. See e.g., United States v. Checoura, 176 F.Supp.2d 310 (D.N.J. 2001) (determining that a two-level downward departure for diminished capacity was appropriate in sentencing a defendant convicted of interstate transportation of stolen property, who suffered from a compulsive gambling disorder); United States v. Bennett, 9 F.Supp.2d 513 (E.D. Pa), aff'd, 161F.3d 171 (3d Cir. 1998) (granting a 91 month downward departure for a defendant convicted of, *inter alia*, wire fraud, based on his diminished capacity and other factors). Courts in other jurisdictions have granted or affirmed downward departures based on mental health and/or diminished capacity grounds, including disorders related to service in the military. See, e.g., United States v. Risse, 83 F.3d 212 (8th Cir. 1996) (finding, in a 924(c) and 922(g) case, that the district court's downward departure for defendant's diminished capacity was proper due to his service in Vietnam and over-representation of criminal history).

Dr. Barber's report details and explains the effects of Mr. Sharif's PTSD, how it was a "decisive factor in his behavior," and how it continues to affect him today. Counsel submits that a departure based on Mr. Sharif's mental and emotional condition and diminished capacity is warranted in this case.

**C.  The Court Should Impose a Sentencing Variance Based on the Section 3553(a) Factors**

After the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005) rendered the Sentencing Guidelines advisory, district courts must now treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a).  In <u>Kimbrough v. United States</u>, 128 S.Ct. 558 (2007), the Supreme Court explained that "[t]he statute, as modified by <u>Booker</u>, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goal of sentencing," and that "while the statute still requires a court to give respectful consideration to the Guidelines . . . <u>Booker</u> permits the court to tailor the sentence in light of other statutory concerns as well." <u>Id.</u> at 570.  <u>See</u> <u>also</u>, <u>Gall v. United States</u>, 128 S.Ct. 586 (2007) (stating that courts may not presume that the Guidelines range is reasonable and must make an individualized assessment based on the facts presented).

Pursuant to Section 3553(a), the court should consider the following factors in imposing a sentence that complies with the purposes of sentencing as set forth in paragraph (2) of the statute:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines...

(5) any pertinent policy statement...

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The <u>Booker</u> Court further explained that, under the Sentencing Reform Act, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense, which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." <u>Id.</u> at 251 (quoting 18 U.S.C. § 3661). Thus, post-<u>Booker</u>, courts are required to consider factors that the Guidelines discourage, such as the defendant's mental and emotional conditions and physical condition, including drug or alcohol dependence or abuse. <u>See</u> U.S.S.G. § 5H1.

Mr. Sharif respectfully submits that a sentencing variance is proper in this case based on his mental and emotional health, personal history and circumstances, the over-representation of his criminal history, and the impact of a lengthy incarceration versus substantive mental health treatment. Additionally, a variance would achieve the goals of sentencing, while a lengthier sentence would not.

Courts are increasingly granting variances for soldiers suffering from mental health disorders for the reasons previously argued, and because of their military service. The courts' discretion is in response to the reality that the Sentencing Guidelines do not reflect the uniqueness of these types of cases. <u>See</u> <u>e.g.</u>, <u>United States v. Jager</u>, No. CR 10-1531-JB, 2011 WL 831279 (D.N.M., February

17, 2011) (granting a downward variance in a child pornography case because of the defendant's military service); United States v. Oldani, No. 2:09-0010, 2009 WL 1770116 (S.D.W.Va, June 16, 2009) (granting a "substantial downward variance" based on the defendant's honorable service and diagnosis of PTSD); United States v. Brownfield, No. 08-cr-00452 (D.Col. Dec. 18, 2009) (granting a variance to a defendant diagnosed with PTSD, and stating that Sentencing Guidelines do not address returning veterans who have served in Afghanistan and Iraq).

Mr. Sharif's sentencing guidelines range is largely driven by the amount of drugs involved in the offense conduct. He does not seek to minimize his behavior, and he is subject to a mandatory minimum sentence that reflects the seriousness of his actions. But the range does not represent his: honorable service to this country, particularly as a Muslim soldier fighting in a Muslim country; his trauma and resulting PTSD; the significance of his earlier accomplishments despite secretly battling the inner pain of his father's rejection; his high likelihood for successful rehabilitation; and the lack of mental health treatment available to him in prison.

It is easy to say that Mr. Sharif had it all and lost it because of his poor decisions, or to hold his accomplishments against him because he had opportunities that others do not. Mr. Sharif, however, lost it all well before he engaged in the offense conduct, and he has experienced horrific things that other offenders have not. The Sentencing Guidelines range suggests a man who is a hardened drug dealer, but Mr. Sharif is a soldier whose life fell into shambles because of his war experiences.

A lengthy sentence will not serve him, and it will continue the cycle of soldiers who are not treated for their disorders. In United States v. Oldani, 2009 WL 1770116, the district court noted:

19

> The BOP is not uniquely situated, as is the VA, to treat the signature injuries from the United States' current military engagements. Counselors at the BOP would be less likely to have received specific training to treat veterans and deal, for example, with the type of events that brought on a soldiers' PTSD. Finally, group sessions conducted by the BOP would likely be available to the entire prison population (at least those subject to a specific disability) rather than being limited to veterans.

Id. at *21-22.

Dr. Barber echoes this finding in her report and recommends that Mr. Sharif seek assistance through the Veterans Administration because it is unlikely that his issues will resolve while he is incarcerated. Id. at 15. This is of great concern because, as Dr. Barber found, "the single most influential factor in Mr. Sharif's capacity to fully rehabilitate and refrain from any similar future conduct will be his access to effective treatment to resolve his Post Traumatic Stress Disorder." Id. Dr. Barber notes, however, that Mr. Sharif is actually at "a substantially lower risk of re-offending than the average offender within his comparable age range. This is because his criminal conduct arose in a very specific set of circumstances and is unlikely to be repeated now that the behavior has been brought to light and consequences have ensued, and also because he displays extraordinary remorse for the conduct." Id. at 13.

The Guidelines in this case reflect a harsh punishment, but not the specific individual. Mr. Shariff made a grave mistake, but he still has a future that can produce the good citizen he was raised and trained to be. Mr. Sharif's background, with treatment and counseling, will greatly aid his rehabilitation, and the mandatory minimum sentence is a true reflection of the offense and the individual.

Mr. Sharif's life is a cautionary tale, but it is not the tale of a man who squandered his opportunities. Mr. Sharif's life is the story of thousands of soldiers who left to fight a war and never fully returned home after combat.

## V.  CONCLUSION

For all of the above stated reasons, and any other reasons that this Court may find, Mr. Sharif respectfully requests that this Court grant a departure and sentencing variance below the advisory Guidelines range and impose a sentence of 60 months, followed by supervised release.  This sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Respectfully submitted,

/s/Edson A. Bostic
Edson A. Bostic, Esquire
Federal Public Defender

Tieffa N. Harper
Research & Writing Attorney

Attorneys for Salem Sharif

Federal Public Defender's Office
District of Delaware
800 King Street, Suite 200
Wilmington, Delaware  19801
(302) 573-6010
ecf_de@msn.com

Dated: May 2, 2013

21